SO ORDERED: June 13, 2008.

_____
Anthony J. Metz III
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| PAMELA JEAN MYERS | )  CASE NO. 07-11145-AJM-13 |
| | ) |
| Debtor | ) |

**ORDER SUSTAINING OBJECTION TO CONFIRMATION
and ORDER DIRECTING DEBTOR TO FILE AMENDED CHAPTER 13 PLAN**

*Background*

The Debtor filed her chapter 13 case on November 9, 2007 (the "Petition Date"). Within 910 days of the Petition Date, the Debtor entered into a retail installment contract whereby she purchased a 2007 Dodge Caliber (the "Vehicle") from Danville Chrysler Dodge Jeep, Inc. ("Danville"). The contract provided that the "cash price" of the Vehicle was $17,003.20. As a component of the sale, the Debtor traded in her 2006 Jeep Wrangler which was worth $16,7000 but upon which she owed $26,409.00. The "negative equity" of $9709 (the difference between the value of the Wrangler and

1

the amount owed on it) was rolled into the loan, along with charges for gap insurance and certificate of title fees ($435.00), resulting in a total loan financed of $27,147.20. There was neither a downpayment by the Debtor nor a rebate from Danville included in the transaction.  Danville obtained a security interest in the Vehicle and assigned its interests under the contract to Daimler Chrysler Financial Services of America, LLC ("Daimler").

Daimler filed a proof of claim in the amount of $25,101.25. The Debtor's chapter 13 plan provides that Daimler holds a secured claim in the Vehicle in the amount of $15,000, payable at 9.5%, to which Daimler has objected on the basis that the Debtor is prohibited by the "hanging paragraph" from "cramming down" its claim.

Hearing on Daimler's objection was held on March 25, 2008 wherein Daimler was given 30 days from that date to file a brief in support of its objection.  That brief was filed on April 23, 2008.  This entry shall constitute findings of fact and conclusions of law to the extent required under Fed. R Bankr. P. 7052 and 9014.

## *Discussion*

### *BAPCPA and the "Hanging Paragraph"*

Prior to the enactment of BAPCPA,[1] chapter 13 debtors who owed more on their cars than their cars were worth could take advantage of §506 and "cram down" or "bifurcate" the claim into its secured (fair market value) and unsecured deficiency (the balance) parts, with only the secured portion having to be paid in full.  BAPCPA eliminates that advantage for claims secured by vehicles purchased within or less than

---

[1] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, applicable to cases filed on and after October 17, 2005.

2

910 days of the bankruptcy filing, ("910 claims") by providing that §506's bifurcation provisions shall not apply to them. Thus, a 910 claim cannot be "crammed down" and must be paid in full, regardless of the fair market value of the vehicle securing it. The BAPCPA provision that imposes this limitation is found following §1325(a)(9) but is neither related to §1325(a)(9) nor has its own numbered subparagraph. It is sometimes denoted as §1325(a)(*), and has earned the name, and will be referred to herein, as "the hanging paragraph". It provides in pertinent part:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle...acquired for the personal use of the debtor....

The parties do not dispute that the Vehicle is a "motor vehicle" which was purchased with 910 days of the Petition Date for the Debtor's personal use. Nor do the parties dispute that Daimler has a purchase money security interest in the Vehicle, to the extent of its "cash price" of $17,003.20. The only dispute is whether Daimler's purchase money security interest likewise covers the funds used to pay the negative equity ($9709). If it does, the hanging paragraph applies, the Debtor is prohibited from cramming down Daimler's claim, and Daimler's claim must be treated as fully secured under the Debtor's chapter 13 plan. If this is the case, the Debtor's plan as it currently stands cannot be confirmed under §1325(a)(1). If Daimler's purchase money security interest does not cover the negative equity, the Court has to decide how to apply the hanging paragraph, whether the entire claim can be bifurcated or just the non purchase money portion of it.

3

The plethora of cases on this issue appear to break under three distinct approaches. The first holds that the financing of negative equity on a trade in as part of the overall car sales transaction does not destroy the purchase money character of the loan and therefore the hanging paragraph applies and the creditor's claim cannot be bifurcated. [2] The second involves those cases that find that the financing of the negative equity destroys entirely the purchase money character of the security interest and therefore the claim can be bifurcated since the hanging paragraph does not apply.[3] The third holds that the creditor's security interest loses its purchase money status only *to the extent* the loan was used to pay the negative equity, thus creating an security interest with both purchase money and nonpurchase money components, with the hanging paragraph applying only to the purchase money portion. [4]   It is worth noting

---

[2] See, *In re Ford*, -B.R.-, 2008 WL 2095677 (Bankr. D.Kan); *In re Gray*, 382 B.R. 438 (Bankr. E.D. Tenn. 2008)(but reaching conclusion on different grounds where downpayment and rebate exceeded negative equity, and contract provided that downpayment and rebate be applied first to negative equity, thus finding that no part of loan was used to pay negative equity); *In re Austin*, 381 B.R. 892 (Bankr. D. Utah, 2008); *In re Dunlap*, 383 B.R. 113 (Bankr. E.D.Wis. 2008); *In re Vinson*, -B.R.-, 2008 WL 319678 (Bankr. D.S.C.); *In re Schwalm*, 380 B.R. 630 (Bankr. M.D. Fla. 2008); *In re Weiser*, 381 B.R. 263 (Bankr. W.D. Mo. 2007); *In re Brei*, -B.R.-, 2007 WL 4104884 (Bankr. D. Ariz.); *In re Burt*, 378 B.R. 352 (Bankr. D. Utah, 2007); *In re Wall*, 376 B.R. 769 (Bankr. W.D.N.C., 2007); *In re Cohrs*, 373 B.R. 107 (Bankr.E.D.Cal. 2007); *In re Petrocci*, 370 B.R. 489 (Bankr. N.D.N.Y., 2007).

[3] After determining that the portion of a loan that pays the negative equity is not purchase money, the following courts do *not* look further to applicable state (UCC) law to determine whether to apply the "transformation "or "dual status" rule; instead, their inquiry under state law stops there and they hold that the *hanging paragraph* requires the *entire claim* of the creditor to be purchase money.  Because a portion of the claim is nonpurchase money, they hold that the hanging paragraph does not apply: *In re Look*, 383 B.R. 210 (Bankr. D. Me. 2008); *In re Mitchell*, 379 B.R.131 (Bankr. M.D. Tenn., 2007); *In re Sanders*, 377 B.R. 836 (Bankr. W.D. Tex., 2007).  The following cases *do* look further to applicable state law and apply the "transformation" rule whereby the financing of the negative equity (nonpurchase money portion) "transforms" the purchase money portion into non purchase money; *In re Blakeslee*, 377 B.R. 724 (Bankr. M.D. Fla. 2007); *In re Westfall*, 365 B.R. 755 (Bankr. N.D. Ohio, 2007).

[4] After determining that the portion of the loan that pays the negative equity is not purchase money, the following courts look further to applicable state (UCC) law and conclude that the "dual status" rule should be applied: *In re Padgett,* Case No. 07-41284 (Bankr. D. Kan. May 27, 2008); *In re Wear*, -B.R.-, 2008 WL 217172 (Bankr.W.D. Wash); *In re Johnson,* 380 B.R. 236 (Bankr. D.Or. 2007); *In re Lavigne,* -B.R.-, 2007 WL 3469454 (Bankr. E.D.Va.); *In re Conyers*, 379 B.R. 576 (Bankr. M.D.N.C.,

4

that, of the three published district court opinions on the issue, two courts have adopted the first approach, [5] and one court has adopted the third approach. [6] The issue is currently pending before the Tenth Circuit Court of Appeals. [7] For the reasons stated below, this Court finds the reasoning of the first approach persuasive and adopts it as to the facts here.

### *"Purchase Money Security Interest"*

The inquiry of whether Daimler has a purchase money security interest in the Vehicle begins with the definition of "purchase money security interest". Since the Bankruptcy Code contains no definition for "purchase money security interest", courts have looked to state law to fill the void. *General Motors Acceptance Corporation v. Peaslee*, 373 B.R. 252, 257 (W.D.N.Y. 2007) (*"Peaslee II"*). Indiana's version of Article 9 of the Uniform Commercial Code in Ind. Code §26-1-9.1-103(b)(1) defines "purchase money security interest", in pertinent part, as:

(b) A security interest in goods is a purchase money security interest :

(1) to the extent that the goods are the purchase money collateral with respect to

---

2007); *In re Hayes,* 376 B.R. 655 (Bankr. M.D. Tenn., 2007); *In re Gibson,* Case No. 07-90752-BHL-13 (Bankr. S. D. Ind. October 25, 2007); *In re Kellerman,* 377 B.R. 302 (Bankr. D. Kan., 2007); *In re Pajot*, 371 B.R. 139 (Bankr. E.D. Va., 2007); *In re Acaya*, 369 B.R. 564 (Bankr. N.D. Cal., 2007).

[5] *In re Graupner*, 2007 WL 1858291 (M.D. Ga.); *In re Peaslee*, 373 B.R. 252 (W.D. N.Y. 2007) (reversing the bankruptcy court in *In re Peaslee*, 358 B.R. 545 (Bankr. W.D.N.Y. 2007)).

[6] *In re Hernadez-Simpson,* 369 B.R. 36 (D. Kan. 2007).

[7] *Wells Fargo Bank, N.A. v. Hunt (In re Hunt)*, No. 07-3297 (10th Cir.) The Bankruptcy Court below found that the portion of the loan that was used to pay the negative equity was not entitled to purchase money status. The Court held that, with respect to consumer transactions under Missouri's version of the UCC, a transaction that has both purchase money and non purchase money components "transforms" the entire transaction into nonpurchase money, thus, rendering the hanging paragraph inapplicable. *In re Hunt*, Case No. 07-20627 (Bankr. D. Kan. August 13, 2007). The case was argued before the Tenth Circuit Court of Appeals on May 14, 2008.

that security interest.

"Purchase money collateral", in turn, is defined in Ind Code §26-1-9.1-103(a)(1) as:

(1) ... goods or software that secures a purchase money obligation incurred with respect to that collateral".

Finally, "purchase money obligation" is defined in Ind Code §26-1-9.1-103(a)(2) as:

(2) ... an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in, or the use of the collateral if the value is in fact so used.

Thus, if the debt created by the money loaned or the credit extended was (1) incurred as all or part of the price of the collateral *or* (2) for value given by the creditor to the debtor to enable the debtor to acquire rights in or the use of the collateral, the debt so incurred is a "purchase money obligation"; the collateral which was purchased by the debtor and in which the creditor takes a security interest is "purchase money collateral"; and the security interest obtained in the collateral by the creditor is a "purchase money security interest".

The determination of whether Daimler's purchase money security interest extends to the portion of the loan that paid the negative equity begins with whether the negative equity loan is a "purchase money obligation". For it to be a "purchase money obligation", the loan must have either (1) been incurred as all or part of the price of the Vehicle or (2) was value given by Daimler to enable the Debtor to acquire rights in (ownership) or the use of the Vehicle.

6

### *"Price of the Collateral" or*
### *"Value Given to Enable"*

Neither the uniform act nor Indiana's version of the Uniform Commercial Code defines "price" or "value" as used in the phrases "price of the collateral" and "value given to enable", but Comment 3 following Ind Code §26-1-9.1-103 is instructive:

> ...the definition of "purchase money obligation", "price of the collateral" or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations...

Critics of the first approach argue that "negative equity" is not the "price of the collateral" or the "value given to enable" a debtor to acquire rights in the collateral because it is not mentioned as an example in Comment 3. They further argue that the examples given in Comment 3 demonstrate that only expenses that are "directly" associated with and incidental to the vehicle purchase are to be included in the definition of "price" or "value" and negative equity is unlike those expenses in both kind and scope. See, *In re Look*, 383 B.R. 210, 219 (Bankr. D. Me. 2008); *In re Sanders*, 377 B.R. 836, 855 (Bankr. W.D. Tex. 2007). Some argue that "price" should be limited to the actual price of the collateral being acquired, namely the "sticker price" or "cash price" of the new vehicle. See, *In re Peaslee*, 358 B.R. 545 (Bankr. W.D.N.Y. 2005) ("*Peaslee I*") rev'd , 373 B.R. 252 (W.D.N.Y. 2007) ("*Peaslee II*"); *In re Blakeslee*, 377 B.R. 724, 728 (Bankr. M.D. Fla. 2007).

It is evident that Comment 3 on its face does not limit the definition of "price of the collateral" or "value given" only to types of minor, direct and incidental expenses and certainly does not refer only to the sticker or cash price of the vehicle. The fact that

7

"attorneys fees" are expressly mentioned belies the notion that "price" or "value" is narrowly viewed as only those expenses that *must* be paid to drive the car off the lot. Comment 3 expressly "includes" the broad phrase "obligations for expenses incurred in connection with acquiring rights in the collateral". Following that phrase are ten (10) examples ("sales taxes", "duties", "finance charges" and "interest", to name a few) but those examples are *not* examples of "expenses incurred in connection with acquiring rights in the collateral". Rather, they are additional components of "price" of the collateral or of "value given" by the debtor. *Peaslee II*, 373 B.R. at 258-259; *In re Burt*, 378 B.R. 352, 360 (Bankr. D. Utah 2007). Furthermore, the "catchall" phrase, "*and other similar obligations*" appearing at the end of Comment 3 demonstrates that the list of examples contained in Comment 3 is not an exclusive one. *In re Cohrs*, 373 B.R. 107, 109 (Bankr. E. D. Cal. 2007). Had the drafters of the UCC and Comment 3 intended to limit the definition of "price" and "value" to the examples given, they could have so stated. Nothing in Comment 3 qualitatively or quantitatively limits the definition of "price" and "value"; rather the focus is whether the obligation broadly includes "expenses incurred in connection with acquiring rights in the collateral" or whether they are (as stated at the end of Comment 3), "other similar obligations". Thus, the definitions of "price" and "value" should be interpreted broadly. *Burt*, 378 B.R. at 360-361; *In re Dunlap*, 383 B.R. 113, 117 (Bankr. E. D. Wis. 2008).

 For the Debtor here to acquire ownership rights in the Vehicle, she needed financing and *under this transaction*, she could not get financing without including her trade in of the 2006 Jeep Wrangler. For her to include the trade in, she had to pay off

8

the debt owed on it, and for her to pay the debt owed on the Jeep Wrangler, she had to borrow enough funds to cover the trade in debt as well as the price of the Vehicle. As the Court in *Peaslee II* noted:

> It is not apparent why a refinancing of rolled-in negative equity on a trade in as part of a motor vehicle sale could not constitute an 'expense incurred in connection with acquiring rights' in the new vehicle. If the buyer and seller agree to include the payoff of the outstanding balance on the trade in as an integral part of their transaction...it is in fact difficult to see how that could not be viewed as such an expense.

*Peaslee II*, 373 B.R. at 259. Like the court in *Peaslee II*, this Court finds that it is difficult to see how the funds used to pay the negative equity here could not be viewed as an expense incurred in connection with acquiring rights in the Vehicle, and moreover believes the negative equity financing here is "precisely the type" of such expense. *Burt*, 378 B.R. at 360. *In re Austin*, 381 B.R. 892, 897 (Bankr. D. Utah 2008).

### *Close Nexus*

Comment 3 also provides that "[t]he concept of 'purchase money security interest' requires a close nexus between the acquisition of the collateral and the secured obligation." The financing of the negative equity and the financing of the Vehicle were part of the same transaction and came as a package deal. Payment of the trade in debt, and thus financing of the negative equity, was a prerequisite to consummating the sales transaction and utilizing the negative equity financing accomplished the goal of purchase and sale of the Vehicle. *Dunlap*, 383 B.R. at 118. The negative equity financing was "inextricably linked" to the financing of the Vehicle and in this particular transaction, one would not take place without the other. *In re Petrocci*, 370 B.R. 489, 499-500 (Bankr. N.D.N.Y., 2007). Where parties agree to a

9

"package transaction" in which the negative equity in inextricably intertwined with the sales transaction and the financing of the purchase, the "close nexus" exists and lends further support that the financing of the negative equity must have been considered as part of the "price of the collateral". *Burt*, 378 B.R. at 360-61.

Some courts that have taken the opposite view have likened the financing of negative equity to the financing by the dealer of the customer's unsecured credit card debt. As these courts surmise, it would be absurd for the payoff of the credit card debt to be classified as a "purchase money obligation", even if the payoff of credit card debt freed up credit and cash "to enable" the customer to purchase the vehicle. See, *Sanders,* 377 B.R. at 854. However, the problem of analogizing the financing of negative equity to the "financing" of credit card debt is that they are two entirely different transactions. The customer who gets his or her credit card debt paid by the dealer still retains whatever goods bought with the credit card; those goods are not "traded in" to the dealer as part of the new vehicle purchase. In the trade in situation as we have here, the debtor gives up collateral in exchange for one item of "new" collateral, the new vehicle. Had the Debtor here kept the Jeep Wrangler, the Court would have reached a different result, for the part of the loan that was used to pay off the Jeep Wrangler did *not* enable the Debtor to acquire rights in the Caliber, it merely paid off an existing debt on the Wrangler. See, *Cohrs*, 373 B.R. at 110; *In re Weiser*, 381 B.R. 263, 270 (Bankr. W. D. Mo. 2007); *Petrocci*, 370 B.R. at 503. Thus, such a transaction would have had both purchase money and non purchase money attributes, at which point the Court could have either concluded that the hanging paragraph should apply (as in the second line of cases) or applied the dual-status rule (as in the third line of cases) since Ind

10

Code §26-1-9.1-103 applies to both consumer and nonconsumer transactions. However, the Debtor here retained only one item of collateral, the Caliber, and the financing of the negative equity in the Wrangler was essential and an integral part to her acquiring rights in the Caliber.

Thus, the Court concludes that the financing of the negative equity was an expense that was both part of the "price of the collateral" and the "value given" that enabled the Debtor to acquire rights in the Vehicle. There was a sufficiently "close nexus" between the acquisition of the Vehicle and Daimler's financing of the negative equity. Daimler's purchase money security interest covers the $9709 used to finance the negative equity and its entire claim is protected under the hanging paragraph and cannot be bifurcated.

### *Congressional Intent*

Finally, the Court is persuaded that, given the creditor-oriented tenor of BAPCPA, the hanging paragraph was intended to protect secured creditors in situations such as this. When BAPCPA was enacted, the inclusion of the payoff of debt for a trade in vehicle in automobile loans was already common industry practice. *In re Schwalm*, 380 B.R. 630, 634 (Bankr. M. D. Fla. 2008). One of BAPCPA's goals "was to afford additional protection for secured creditors, and primarily, for automobile lenders". *Dunlap*, 383 B.R. at 118. This Court doubts that Congress would have gone to the trouble of enacting the hanging paragraph for the benefit of automobile lenders just to render it inapplicable to typical and common automobile financing transactions such as this. *See, Schwalm*, 380 B.R. at 634. Rather, Congress intended to" protect the

interests of automobile dealers who provide financing for customers" by ensuring that "debtors could not load up on vehicle-secured debt pre-petition only to cram it down to the collateral value in the bankruptcy" *Peaslee* II, 373 B.R. at 261.

### *Order*

Daimler's objection to confirmation is SUSTAINED. The Debtor shall file an amended chapter 13 plan providing for treatment of Daimler's secured claim consistent with this opinion within thirty (30) days of the date of this order.

### # # #

Distribution:

Chris Holmes, Attorney for the Debtor
Elizabeth Alphin, Attorney for Daimler
Chapter 13 Trustee
United States Trustee